OPINION OF THE COURT
Charles E. Ramos, J.
The defendant Mercedes-Benz of North America’s (MBNA) *369 motion for a protective order vacating the plaintiffs demand for the production of documents and to require the plaintiff to designate an expert, and the plaintiff’s cross motion to compel the production of the disputed documents and to add Mercedes-Benz AG. (MBAG) as a party defendant, are disposed of as follows.
This action arises out of an automobile accident that was tragic, not only in its immediate consequence of the loss of a life, but that also suggests further tragedy in that it portends serious injury and loss of life to others as so-called passive restraint systems are installed in motor vehicles sold in the United States and abroad. A passive restraint system is typically an automated safety belt or an air bag, either of which are intended to function in the event of an accident without the active participation of the occupant/user. On the other hand, an active restraint, such as a conventional three-point lap and shoulder belt requires that the device be fastened by the occupant. Restraint systems, whether active or passive, are the only effective and economical means to reduce the incidence of serious injury in motor vehicle accidents. Any limitation or defect in the performance of such restraint systems translate into an immediate threat to the safety of the public. The facts alleged in this action call into question the effectiveness of one of these systems, the passive restraint known as the air bag.
The thrust of this motion is to determine the scope of discovery to be permitted to the plaintiff, particularly with regard to the air bag, its development and its limitations.
Esther Orlich (the deceased) is alleged to have suffered fatal injuries in a one-car accident on the New Jersey Turnpike. She was a businesswoman, traveling alone at 10:30 on a clear spring morning heading for her company’s office where she served as its national sales manager. The car she was driving was a late model Mercedes-Benz 300-E equipped with active restraints (lap and shoulder belts) and a passive restraint, specifically an air bag. The air bag in this particular model is located in the hub of the steering wheel and is thereby intended to protect the driver.
The record indicates that the deceased was not using her safety belts (active restraints) but that she was relying solely upon the air bag to provide automatic crash protection. In light of the severity of the injuries sustained by the deceased and the relatively slight damage to the vehicle, it is apparent *370 that these much ballyhooed passive restraints may suffer from serious limitations not generally known by the consuming public. It does not follow that any determinations are being made regarding liability at this stage of the proceedings. However, if an automobile manufacturer installs a safety device which it has reason to believe will be substituted for the proven lap and shoulder belts heretofore supplied and that new device proves to be less effective than it is represented to be, the manufacturer installs such a device at the risk of being held answerable in money damages for the economic loss, pain and suffering occasioned by reasonable reliance on that device.
A brief review of the history of passive restraints is warranted because of the scope of discovery to be afforded the plaintiff in this regard.
The concept of the air bag is not new. It was conceived in the 1950s as an unsuccessful safety proposal for airlines. The technology continued to develop until by the end of the 1960s it was asserted that the air bag was ready for use in automobiles. The air bag consists of three components, a sensing device (located near the transmission in the case of a Mercedes-Benz 300-E), an inflatable plastic bag and a lVi-pound charge of explosive propellant (typically sodium azide). In the event of a collision the sensor ignites the propellant which inflates the bag. The bag deploys in front of the driver (in this case from the steering wheel hub) and cushions any impact. The bag is made of a porous plastic which deflates in a matter of seconds.
It was imagined that by incorporating such an automatic system in motor vehicles, occupants could be protected even if they failed to use as simple and proven a safety device as a lap and shoulder belt which equipment has been a standard feature in cars for many years. Much testing of air bags and a more thoughtful analysis have overcome the early unquestioning acceptance of the air bag as a substitute for safety belts. The manufacturers and proponents of air bags now admit that the device cannot stand alone, but rather that it is only a supplement to a lap and shoulder belt (active) system (see, Owners Manual for Mercedes-Benz 300-E). Unfortunately, the fact that it is only a supplement is not generally understood.
It has been conceded by MBNA that the air bag installed in Mrs. Orlich’s Mercedes-Benz 300-E, like all air bags, offers effective protection limited to frontal collisions only.
*371 What happened to Mrs. Orlich was predicted by critics of the air bag passive restraint years ago (see, Gates, Review and Critique of NHTSA’s Revised Restraint System Cost Benefit Analysis, Econocim & Science Planning, Inc., May 1, 1975). The basic flaw with the air bag as a passive restraint, as demonstrated in Mrs. Orlich’s accident, is that it is not a true restraint. It did not hold her in her seat, it did not protect her when the car turned over, it did not save her from fatal injury when she side-impacted into a tree, it never even deployed. Because the air bag was not designed to function in anything but a frontal collision, the deceased was never restrained. In short, in Mrs. Orlich’s case the air bag was useless.
This court is compelled to ask the question, would she have been better off if her car had not been so equipped? The reason why the deceased failed to wear her lap and shoulder belt (which would have restrained her in a roll-over) may have been that she knew the car was equipped with an air bag. Notwithstanding warnings to consumers in new car instruction manuals, the plaintiff may assert at trial that MBNA and other manufacturers of motor vehicles knew, or should have known, that fewer drivers and passengers use lap and shoulder belts in vehicles equipped with air bags because they are confident they can rely on them (the air bags) for automatic crash protection. It is ironic that because of its limitations a device designed and intended to reduce injury may actually produce the opposite result.
Misrepresentations of the effectiveness of air bags and the reassuring knowledge that a technologically sophisticated safety device has been installed and is poised to deploy in the event of an accident can create a false impression of relative safety. In this regard it is particularly distressing to note that the National Highway Traffic Safety Administration continues to describe the benefits, but not the limitations of air bags in print (see, Protecting Yourself Automatically, US Dept of Transp HS 806 866 [1986]).
Of course, it will be up to the jury to decide, if in light of the acknowledged limitations of air bags, whether liability will attach simply because the manufacturer installed an air bag which it had reason to believe consumers might rely upon as a stand-alone system. In the event the jury concludes that Mrs. Orlich reasonably relied upon the air bag and thereby failed to use her lap and shoulder belt, it will be permitted to disregard the defense asserted by MBNA that Mrs. Orlich *372 failed to use her safety belts. Such a determination will answer the court’s question, "yes.” The deceased would have been better off if her car had not been equipped with an air bag because, in the view of the jury, the existence of the air bag caused Mrs. Orlich not to use her belt.
The facts in this case may confirm prior predictions of an increased likelihood of serious injury and death in the event the public relies on air bags. In this regard, it will be necessary to permit discovery of the manufacturer’s records not only for the 300-E, but all Mercedes-Benz passive restraint research in order to determine the extent to which Mercedes-Benz could anticipate incidents such as the one that took the life of Mrs. Orlich.
There are three factors involving air bags that weigh heavily upon the court with regard to public safety. The first deals with the limitations of the air bag as a restraint, described above. The second is the obvious inability of the air bag to assist a driver to maintain control of a vehicle. The deceased was observed by those following her to have strayed from her lane and to have struck a glancing blow to the center median of the Turnpike. Once that happened, she lost control of her car, never regaining it. Out of control, her car moved away from the center to the verge, rolled and side-impacted against a tree.
It is likely that an expert witness will testify at trial that if she had been wearing her lap and shoulder belts, not only would she have avoided injury, but that she more likely would have regained control and not have rolled or impacted. Without the assistance of a safety belt, her steering wheel may have been the only thing she could hold on to, rendering it impossible for her to use it as a means to control her car. Consequently, the plaintiff will be permitted to examine documents which relate to research conducted by Mercedes-Benz on the role of safety belts in accident avoidance. The greater the role of safety belts in avoiding accidents, the more relative risk to the plaintiff to rely on air bags and not to have used her safety belts.
The third factor is not relevant to this case, but is of such a matter of public concern that the court will raise it sua sponte in the hope the attention of the appropriate authorities will be drawn to it. That factor is that the chemical propellant, sodium azide, poses such a long-term health hazard that any alleged benefit of air bags may be negated by its toxic effects.
*373 Sodium azide is the propellant used by most if not all of the air bag manufacturers. When an air bag deploys, the sodium azide explodes and then escapes into the car’s interior as the bag deflates. All occupants of the vehicle are exposed to the residue of the explosion. Sodium azide is classified as a class B poison by the Materials Transportation Bureau and is rated as a hazardous material. It has been alleged that sodium azide is a mutagenic, that is, a chemical capable of inducing gene mutations which can cause cancer to those exposed, as well as birth defects in future generations. A lVi-pound charge of this material accompanies each and every air bag. Multiply 1 Vi pounds per air bag by the number of cars sold in one year and the proportions of the environmental impact become clear. Recovery and disposal procedures for this chemical from used or abandoned cars remain unknown.
This court is optimistic that the relative disadvantages and limitations of the air bag as a passive restraint will result in further legislative or administrative action to modify such devices from their present configuration or a voluntary decision by automobile manufacturers to install alternative systems of passive restraint which can stand alone, i.e., are not merely supplements. The potential harm to the public can be statistically predicted based upon the known rate of safety belt usage (now 46% nationwide). If safety belt usage drops because of consumer reliance upon air bags a sharp increase in injury and death on our highways is likely because 50% of all fatal accidents do not involve frontal impact and air bags are only effective in frontal accidents. (See, US Dept of Transp; News [Aug. 31,1989].)
With regard to the discovery sought and directed herein, in order to aid the parties and to avoid the production of unnecessary documents, counsel are directed to contact chambers for the purpose of scheduling a discovery conference. Counsel for MBNA shall be accompanied by such representatives as may be appropriate to assist the court and counsel in identifying or locating the relevant documents.
In addition to information regarding air bags, the plaintiff also seeks extensive discovery regarding the automatic cruise control as it may relate to unintended acceleration, as well as crashworthiness documentation on the 300-E model. The absence of anything in the record to support a claim that the accident was caused by unintended acceleration or any defect in the cruise control (even if it is assumed that it was being *374 used at the time of the accident) or the structure of the vehicle compels this court to grant a protective order with regard to these subjects.
Accordingly, items numbered 2, 3, 4, 5, 6, 7, 9, 14, 15, 17, 18, 21, 22, 23 and 25 of the plaintiff’s demand dated August 10, 1989 are hereby vacated.
The defendant also moves to compel the designation of an expert. That branch of the motion is denied in light of the plaintiff’s contention that no expert has yet been retained who is expected to testify at trial. However, the plaintiff is reminded that the obligation to furnish such information is a continuing one (CPLR 3101 [d] [1]).
The plaintiff cross-moves for leave to join MBAG and Daimler-Benz AG. (DBAG) as parties defendant. MBAG, formerly known as DBAG, is the West German manufacturer of the vehicles sold in America by MBNA. At the time of the commencement of this action, DBAG was named as a party defendant but pursuant to a stipulation the action was discontinued with prejudice as against DBAG upon the express agreement by MBNA that it would "not allege * * * that the claims asserted * * * against [MBNA] should * * * properly be asserted against [DBAG].”
However, MBNA now asserts that because it was not the manufacturer of the vehicle (MBAG was) it is therefore not in control of the witnesses or documents necessary to comply with the discovery herein directed. MBNA seeks to effectively thwart the plaintiff’s right to discovery by contending that access to documents be obtained from MBAG only through the cumbersome procedures of the Hague Convention (The Multilateral Convention on the Taking of Evidence Abroad in Civil Cases and Commercial Matters, 23 UST 2555, TIAS 7444, 847 UNTS 231, eff between the US and W Germany June 26, 1979).
Because of the terms of the stipulation, this court considers the defendant’s contention without merit and the Hague Convention to be inapplicable. Pursuant to that stipulation MBNA has obligated itself to defend this action and not to avoid its obligations by disingenuously suggesting that the plaintiff is litigating with the wrong Mercedes-Benz entity. In the unlikely event that MBNA cannot obtain the cooperation of MBAG to obtain the documents and witnesses, then upon good cause shown by MBNA within 60 days from the date of this order, it will be relieved of those provisions of this order *375 it is unable in good faith to comply with. In light of the possible prejudice to the plaintiff if the claim against DBAG should become time barred, the cross motion is granted joining MBAG/DBAG as a party defendant, which cross motion shall be deemed denied nunc pro tune in the event MBNA complies with the discovery demands duly made in this matter.